IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs August 26, 2020

**DEVIN TORQUIN WATKINS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 105420   Bobby R. McGee, Judge**

**——————————————————**

**No. E2020-00090-CCA-R3-PC**

**——————————————————**

The Petitioner, Devin Torquin Watkins, appeals the denial of his petition for post-conviction relief, arguing that the post-conviction court erred in finding that he received effective assistance of counsel. Following our review, we affirm the judgment of the post-conviction court denying the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and NORMA MCGEE OGLE, J., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the appellant, Devin Torquin Watkins.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Phillip Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In 2012, the Petitioner was convicted by a Knox County Criminal Court jury of two counts of the sale and delivery of .5 grams or more of a substance containing cocaine within 1,000 feet of a public park. After merging the delivery counts into the sale counts, the trial court sentenced the Petitioner to an effective sentence of fourteen years in the Department of Correction. This Court affirmed the convictions on appeal, and our supreme court dismissed the Petitioner's application for permission to appeal as untimely. State v. Devin

<u>Torquin Watkins</u>, No. E2013-00420-CCA-R3-CD, 2014 WL 1329278, at *1 (Tenn. Crim. App. Apr. 3, 2014), <u>perm. app. dismissed</u> (Tenn. July 15, 2014).

Our direct appeal opinion provides the following summary of the case:

Richard Langster testified that, in January 2011, he was working as a confidential informant for Officer Michael Geddings of the Knoxville Police Department ("KPD"). Langster agreed to participate in a controlled purchase of narcotics from [the Petitioner], whom Langster knew only by his nickname, "Black." Langster testified that officers searched him thoroughly before the purchase. Officer Geddings gave him one-hundred dollars and instructed him to purchase "crack or weed or whatever." Langster went to a residence where he knew [the Petitioner] commonly sold drugs, and [the Petitioner] answered the door. [The Petitioner] told Langster that he had some crack, but "it wasn't hardening right." Langster asked him if it was "hard enough to buy," and [the Petitioner] answered that it was. At that point, Langster purchased an "eight ball" of crack from [the Petitioner]. After the purchase, he gave the crack to officers and once again was searched to confirm that he did not have any remaining money or drugs. The audio and video recordings of the purchase were played at trial and admitted into evidence.

The following day, at the direction of Officer Geddings, Langster went back to the residence to attempt to make another controlled purchase of "some powder [cocaine] and some marijuana." Langster testified that he was wearing audio and video recording devices during this purchase as well. On this second occasion, Langster purchased three bags of powder cocaine from [the Petitioner] for ninety dollars as well as some marijuana from another individual at the house. Similarly, to the day before, Langster was searched before and after the purchase. The audio and video recordings of the second transaction also were played at trial and admitted into evidence.

On cross-examination, Langster admitted that he was an "[o]ff and on" drug user around the time he made the purchases from [the Petitioner]. However, he testified that he was not using any type of drugs while working with the KPD because Officer Geddings had forbidden him from "using any type of drugs or doing anything illegal" during the "process."

Officer Michael Geddings testified that, at the time of the events in question, he was working as part of the KPD's "Repeat Offender Squad," which "target[ed] street-level narcotics." Officer Geddings testified that he

- 2 -

employed Langster as a confidential informant to make some controlled drug purchases at 1613 Lombard Place. He testified that, in addition to audio and video recording devices, Langster also was wearing a device that transmitted audio to Officer Geddings while he listened to the events in real time from a nearby, unmarked police vehicle.

Officer Geddings testified that, as a result of Langster's first purchase, he recovered "a plastic baggie which inside of it had a - - white almost a waxy-type substance that was stuck to a piece of Styrofoam." He testified that, "the actual substance was almost stuck onto the Styrofoam." Therefore, when he weighed the substance, he "tore off as much excess Styrofoam as [he] could and just left the Styrofoam that was actually attached to the substance." He weighed the substance at 4.1 grams which he characterized as a "gross weight" because it "t[ook] into account the weight of the baggie as well." He also performed a field test on the substance, and the test indicated positive for the presence of cocaine. Langster's second purchase yielded "three baggies with [a] white powder substance and [a] baggie with [a] green leafy substance." Officer Geddings field-tested the powder, and it also indicated positive for the presence of cocaine. All of the substances were then sealed and sent to the Tennessee Bureau of Investigation ("TBI") to be analyzed.

Shortly after these controlled buys, Officer Geddings executed a search warrant for the residence at 1613 Lombard Place. [The Petitioner] was not present at the residence during that search. At a later date, Officer Geddings received a tip from Langster that the individual he knew as "Black" was driving a specific vehicle at a specific location. Officer Geddings testified that, shortly after receiving this tip, he and KPD Officer Stryker located the vehicle and conducted a traffic stop. Officer Geddings stated that [the Petitioner] was riding in the rear passenger seat, and Officer Geddings "immediately identified" him from the video recordings of the earlier controlled purchases. [The Petitioner] had marijuana on his person, and Officer Geddings issued him a citation. Subsequently, Officer Geddings prepared a photo-array, and Langster positively identified [the Petitioner] as the person whom he knew as "Black" and from whom he had purchased crack and powder cocaine.

On cross-examination, Officer Geddings clarified that the three bags of powder cocaine weighed a total of 1.7 grams.

Sharon Norman testified that, at the time of the events in question, she was working as a forensic drug chemist for the TBI. Norman identified the sealed envelopes submitted to the TBI by Officer Geddings containing the crack and powder cocaine as those which she had tested previously. According to Norman, after removing the crack cocaine from its packaging, it weighed 1.3 grams. She tested the substance and confirmed that it was "cocaine base." She also tested each of the three bags of powder cocaine and confirmed that they also contained cocaine. The total weight of the of powder cocaine was 1.1 grams.

On cross-examination, Norman confirmed that crack often contains "cutting agents" in addition to cocaine, such as baking soda or baking powder. She therefore acknowledged that the actual amount of cocaine contained in a substance possibly could be less than the overall weight; however, she "did not perform a quantitation on this [sample]." Regarding the powder cocaine, she confirmed that it was cocaine, but she was "unable to determine the salt form" because it was "so heavily cut." Therefore, she testified that she could not confirm the precise amount of cocaine contained in the powder substance, although she stated that the amount was too much to be merely "contamination" or "residue."

Trevor McMurray testified that he worked for the Knoxville Geographic Information System. He prepared a map which showed that the residence at 1613 Lombard Place was 562 feet from Babe Ruth Park.

Mike Harris testified that he worked for the City of Knoxville Parks and Recreation Department and identified Babe Ruth Park on the map as a City of Knoxville park.

Id. at *1-3.

On May 1, 2015, the Petitioner filed a pro se petition for post-conviction relief in which he raised a claim of ineffective assistance of counsel. Specifically, he alleged that trial counsel was ineffective for, among other things, failing to conduct a reasonable pretrial investigation, failing to file a motion to suppress video evidence, failing to adequately meet with or communicate with the Petitioner, and failing to call an essential witness at trial. He alleged that appellate counsel was ineffective for failing to file a timely application for permission to appeal to the supreme court.

Following the appointment of post-conviction counsel, the Petitioner filed an amended petition for post-conviction relief on October 28, 2015, in which he requested

that the post-conviction court grant him a delayed Rule 11 appeal due to appellate counsel's failure to either withdraw from representation or to timely filed the Rule 11 application for permission to appeal. On December 17, 2015, the post-conviction court entered an order granting the Petitioner a delayed Rule 11 appeal. On January 5, 2016, the court entered a corrected order with the correct docket number.

At the December 11, 2019 evidentiary hearing, the Petitioner testified that trial counsel was appointed to represent him while he was in pretrial custody. Trial counsel never visited him while he was incarcerated. However, after he was released on bond, he met with trial counsel in trial counsel's office for approximately nine or ten minutes, for the only meeting they ever had before trial. The Petitioner testified that trial counsel told him there were audio and video recordings of the drug sales but that he could not play them for the Petitioner because he was experiencing technical difficulties with his computer.

The Petitioner testified that the only thing he and counsel talked about during that brief office meeting were the facts of the case. Trial counsel did not provide him with any discovery, did not bring up any potential plea offers, and did not discuss any defense strategy or potential defense witnesses. The Petitioner stated that he later called trial counsel's office 15 to 20 times in an attempt to talk with him but was never successful. He said he did not see the video of the drug sales until the day that they were selecting a jury for his trial. Because there were not enough "backup jurors," the jury was not impaneled, and the actual trial did not start until approximately a week later.

The Petitioner stated that he did not learn until the day he first saw the videos that there was a discrepancy in the dates on the videos. He explained that the copy of the video provided to trial counsel was dated 2011 while the copy of the State's video was dated 2010. He, therefore, believed that trial counsel should have filed a motion to suppress the video based on the State's having allegedly tampered with it. Trial counsel, however, did not do so. Moreover, although trial counsel cross-examined Officer Geddings about the discrepancy in the dates, "he allowed [Officer] Geddings to wiggle his way off the hook by just saying that it was a slip of the tongue."

The Petitioner testified that trial counsel did not mention anything about a possible plea offer until the day that they began selecting a jury, when trial counsel told him the State had offered eight years at one hundred percent. He said he did not know if that plea offer was still good at the time his trial began but that he probably would have accepted it if he could have entered a best interest guilty plea. He stated that he told trial counsel that his co-defendant, his uncle, was "willing to take the charge" because the Petitioner had merely handled the transaction on behalf of his uncle, who was passed out on the couch at the time. The Petitioner testified that by the time of his trial, his uncle had already pled

guilty in connection to the charges. He said he asked trial counsel to subpoena his uncle as a witness at his own trial, but counsel failed to do so.

The Petitioner testified that trial counsel informed him that one of the State's witnesses against him was a confidential informant. The Petitioner did not, however, learn of the informant's identity until the day of trial. To his knowledge, trial counsel never investigated the informant's background and never interviewed him.

The Petitioner testified that it was obvious that pieces of the Styrofoam packaging were embedded in some of the drugs. He said trial counsel never filed a motion to suppress the drug evidence on that basis and never cross-examined the chemist about not having removed all of the Styrofoam before she weighed the samples.

The Petitioner also complained about trial counsel's failure to move to suppress photographs of the currency used in the drug transactions and evidence of his co-defendant's drug transaction history with the confidential informant. He said that he thought evidence of the cash should have been excluded because no cash was recovered from his person and that evidence of his co-defendant's history with the informant was irrelevant to his case. He additionally objected to the manner in which trial counsel cross-examined the State's witnesses, testifying that he felt that trial counsel just reinforced the State's case by merely asking the witnesses "the same questions that the prosecution asked, but just worded differently."

The Petitioner further complained about trial counsel's failure to introduce evidence related to the Petitioner's charges in another case, involving the same law enforcement officers, that had been dismissed. The Petitioner explained that he had alibi proof in the form of hotel credit card receipts for the dates of the alleged drug sales in the other case. In his opinion, trial counsel should have introduced the evidence about the dismissed charges and alibi in the other case in order to attack the credibility of the officers. He said that counsel's failure to introduce that evidence relating to the dismissed case indicated to him that there was "a high probability that [trial counsel was] on [the prosecution's] side."

On cross-examination, the Petitioner refused to admit that he either sold or delivered the cocaine at issue in this case, testifying that he merely ushered the undercover informant into the house and showed him where the drugs were because his uncle was "drunk on the couch." He also denied that the informant ever handed him any cash for the drugs. He acknowledged that he had prior convictions for possession of cocaine for resale and aggravated assault. He said that the State's witnesses against him at this trial all offered perjured testimony and that he refused to return for the second day of trial because he realized that "the fix was in." Moreover, when he asked trial counsel at the end of the first day of trial what would happen if he did not return the next day, trial counsel told him that

a mistrial would be declared. Because trial counsel had already "sold [him] out," he thought it was "in [his] best interest not to come back."

Trial counsel testified that he had been a criminal defense attorney for 13 years and had handled several trials over the years. He said he received discovery from the State, which included the videos that clearly showed the Petitioner not only conducting the drug sales but also explaining how to make crack cocaine on a kitchen stove. He stated that he did not hear from the Petitioner after the Petitioner made bond in July. He, therefore, was forced to make multiple attempts to reach him via telephone and mail before the Petitioner finally responded to a letter he sent on November 29, 2011, and came to his office to meet him.

Trial counsel testified that he reviewed with the Petitioner the evidence against him, the enhancements based on the location of the drug sales, and the maximum punishments the Petitioner faced if convicted at trial. He said the Petitioner was adamant that he would not accept an eight-year plea offer and kept expressing his belief that the offenses should not have been enhanced based on their location. Trial counsel, like the Petitioner, recalled that the trial was delayed due to the lack of a sufficient jury pool. Unlike the Petitioner, his memory was that the Petitioner refused to return to the courtroom after the lunch break on the first day of trial rather than on the second day of trial. He was adamant that he never instructed or encouraged the Petitioner to absent himself from the trial.

On cross-examination, trial counsel testified that he recalled one meeting with the Petitioner at his office, but there could have been a second meeting as well. He said the Petitioner never left any telephone messages for him. He stated that both he and the Petitioner knew the identity of the confidential informant from the very beginning of the case, that he investigated the informant's criminal history and background, and that he believed that he brought out the informant's background during cross-examination. He testified that he and the Petitioner never discussed calling the Petitioner's co-defendant as a witness and that he would not have wanted to call him because his understanding was that part of his plea agreement with the State "would have been testifying against [the Petitioner]."

At the conclusion of the hearing the post-conviction court denied the petition, finding, among other things, that the State's proof against the Petitioner, which included the "amazing[ly]" clear video evidence, was "very, very solid." The court further found that the Petitioner failed to present any evidence in support of his allegations that the witnesses perjured themselves or that the district attorney was corrupt. The court, therefore, concluded that the Petitioner failed to meet his burden of showing by clear and convincing evidence that he was denied the effective assistance of trial counsel.

# ANALYSIS

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). Moreover, the reviewing court must indulge a strong presumption that the conduct of

counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.").

The Petitioner argues on appeal that trial counsel was ineffective for not adequately meeting with him before trial to discuss and prepare a defense and not challenging the authenticity of the State's video evidence in light of the discrepancy in the dates. He additionally argues that even if counsel's various alleged deficiencies are not alone sufficient to prejudice the outcome of his case, the cumulative effect of these various alleged errors is enough to warrant his being granted a new trial on the basis of ineffective assistance of counsel. In support of his claims, the Petitioner cites his own testimony about the single brief meeting he had with counsel in which counsel was unable to show him the video evidence.

The post-conviction court, however, found that the Petitioner, who obviously thought he got a "raw deal," failed to present clear and convincing evidence in support of his allegations. The record fully supports the findings and conclusions of the post-conviction court. Trial counsel's testimony, which was implicitly accredited by the post-conviction court, established that he reviewed discovery, investigated and discussed the case with the Petitioner, and made well-informed strategic decisions about witnesses and trial strategy. The Petitioner has failed to show that trial counsel was in any way deficient in his performance or that he was prejudiced as the result of any alleged deficiency on the part of counsel. As such, the Petitioner is not entitled to post-conviction relief.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE